May it please the court, David Reese on behalf of Plaintiff Appellants and I would like to reserve two minutes for rebuttal please. This case raises two pleading issues for claims asserted under Section 10B of the Securities Exchange Act. I will first address how we satisfy the pleading standard for Scienter and then I will address how we satisfy the loss causation requirements. The Supreme Court in the Tellabs case established the definitive standard for reviewing courts to evaluate Scienter allegations. The court set forth the following prescription, Justice Ginsburg writing the opinion. First, the court should accept all the allegations of the complaint as true which is familiar in the motion to dismiss context. Second, the complaint must be assessed in its totality. The issue is not whether isolated allegations meet the standard but whether all the allegations taken collectively establish a strong inference of Scienter. The court also established that reviewing courts should consider plausible innocent inferences for the alleged misconduct. But the Supreme Court expressly stated that a strong inference of Scienter need not be irrefutable or of the smoking gun genre. Rather, the critical question is, and I'm quoting Judge Ginsburg, Justice Ginsburg, when the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of Scienter at least as compelling as any plausible innocent inference? Plaintiffs fully satisfy this standard. This case is about Digimarc's series of materially false financial statements that allowed them to tout their profitability to the market and their sequential growth in profits when in fact they were experiencing deteriorating gross profits and ultimately losses. During the class period, defendants falsely reported over $2 million in income when the company actually experienced a $600,000 loss during this time period. There is no issue in this case that defendants issued materially false financial statements. By restating them, they are admitting that they were materially false at the time they were issued. So the critical question here becomes, is there a more plausible inference that these false financial statements, which allowed the company to tout its profitability and growing profits to the market, were the result of innocent or inadvertent accounting mistakes? Or, based on the facts that we allege, is there at least an equally compelling inference that these fraudulent, that these accounting manipulations were the work of fraudulent intent? Mr. Counsel, can you put that loss in context for me? I have to say that the number $2 million in terms of swing in profits, $2.6 million, just doesn't sound like a very large number to me. I mean, it sounds like the kind of number that, you know, Wall Street loses in change down the sewer. Well, I think you need to consider the context for that, Your Honor. The context here is the company is touting to the market that it's turning the corner to profitability. It's a company that's in the startup mode, has been experiencing losses during its entire history as a public company. Now it's telling the market, we've turned the corner to profitability, and we are reporting sequentially growing profits. And that's a critical fact to the market, that they have turned the corner and they are sequentially growing and they are able to sustain growth and profitability. This has not been a particularly profitable company over the years? In fact, the initial statement that the company issues that commences the class period touts the company's first quarter as a profitable public company. And they tout this to the market. This is, we've reached profitability. We've turned the corner. So that the context for this false income is that this is a company that is touting to the market. We've turned the corner. We've become profitable. We have a sustainable business model. When in fact they were concealing that the only reason they were able to report these profits were accounting manipulations. For example, the accounting manipulations, defendants admitted that $1.3 million of profit reported during the class period was directly attributable to the false capitalization of ordinary payroll expense. Exactly at the time they began to falsely capitalize payroll is the time that Defendant Ranjit ordered the elimination of a critical accounting control over capitalizing payroll. Before this elimination of this accounting control, to capitalize payroll the company required that the employee whose time was being capitalized as software development actually sign off on the fact that he spent that time and it qualified for capitalization and required his supervisor to do the same. After this programming change, Defendant Ranjit took complete control over the account. He could make unilateral changes without any involvement of the people who were actually performing the work. And it's critical that at the exact time period where defendants begin this false capitalization of payroll is exactly when that accounting control was eliminated. Very good. When you're talking about the control, you're talking about the Great Plains system. You're talking about something else. I'm talking about something else, Your Honor. What happened is we have a direct recipient witness account that in the first quarter of 2003, Defendant Ranjit personally ordered the elimination of an accounting control, a computer change that required employee sign off on payroll capitalization of that employee's time. After this change, Defendant Ranjit and his finance department could make changes, could increase the amount of payroll capitalization without any involvement of the employee who was actually performing the work. So this is separate and apart from some other accounting manipulations that relate to their secure accounting systems. And you think there's no innocent explanation for that? I think there's no plausible. I think any innocent explanation is certainly no more compelling than an inference of scienter, especially when you have the admission that defendants were forced to make in the restatement that this is exactly when they began to falsely capitalize payroll. They also admit in the restatement that They stated in the restatement that they earlier had falsely reported these items? Correct. In the restatement, they admit that starting in the first quarter of 2003, that they had reported material amounts of ordinary expenses as capitalized payroll. So they were falsely boosting their income. False is your description? No, Your Honor. In fact, by issuing a restatement, they are admitting to the market that at the time that financial statement was issued, it was materially false when issued. But public companies issue restatements all the time. They're reported in the financial press. And it seems to me unusual that they would describe the reason for that as having earlier engaged in falsehood. I understand your characterism. You believe that your proof will establish that. Correct. But at the time they made the restatement, they restated these earnings and capitalization items. They didn't admit that it was false, right? No, Your Honor. In fact, that is the definition of a restatement, is that at the time, what they're acknowledging to the market is at the time they issued the financial statement, it was incorrect. It was false. Yes, it was materially false at the time it was issued. Now, whether that falsity was the result of inadvertence or accidental accounting errors or whether it was a result of scienter is what this case is about or what this appeal is about. And we believe that we allege the type of interlocking, corroborating facts that establish a strong inference of scienter. We're in your complaint. Which allegations are you dealing with now? Are you dealing with 65 forward, the improper capitalization reported internal software development costs? Is that what you're discussing right now? Yes, Your Honor. I'm talking about software. There are two primary accounting manipulations at issue in this case. There is the improper capitalization of ordinary expenses as software development payroll. The district court thought that one of the reasons that your evidence didn't amount to scienter was because you relied on these confidential witnesses and much of their testimony appears to be hearsay or even double hearsay. And as I look at the paragraphs there that you're referring to, particularly paragraph 68 and 69, I think the district court is probably right, that your confidential witnesses do not have direct information, that they're relying on hearsay. And I don't think that after our decision in Dow, we can do that. I have two responses to that, Your Honor. We have direct percipient witness accounts. For example, with respect to the elimination of the accounting control at issue in the percipient witness account, that Defendant Ranjit personally ordered the elimination of that control at the time that they falsely capitalized, at the time they began to falsely capitalize payroll expense. And that is paragraph 31. I'm sorry. Let me make sure I'm correct here. That's paragraph 67 and 68. The actual person who had made that programming change provided us the direct account of that. In addition to that, in paragraph 31, we have a direct percipient witness account that at the close of every quarter, Defendant Ranjit ordered the creation of spreadsheets so that he could personally manipulate the accounting data and make whatever adjustments were required to meet market's expectation. Again, a direct percipient witness account. And what we have here corroborating that in their restatement, they acknowledge that they capitalized payroll expense without any supporting documentation. Yeah, but if I look at, I'm looking at paragraph 31 now. And according to CW1, Defendant Ranjit was obsessed with meeting the market's earning expectations for DigiMark, okay? That sounds like a lot of corporate executives in this country, okay? That sounds like something that was his responsibility was to be obsessed with those kinds of things. And I'm jumping down just a little bit. According to CW1, the real purpose of this process was to allow Ranjit to determine what purported improper accounting adjustments were needed for the company to meet analysts' earning expectations. Well, that's a conclusion. I don't see any supporting facts for that. Is that what's at back at paragraph 67 and 68? What we have here specifically with respect to these spreadsheets, there's no plausible innocent explanation for the removal of all of the accounting data at the close of every quarter in order to see where you are. We also have corroborating facts directly. We have a former controller who left the company in the first quarter of 2003, who left the company because Defendant Ranjit ordered her to, and this is paragraph 71 of the complaint, she left when Defendant Ranjit ordered her to make last-minute adjustments to the payroll account. Yeah, she objected and left the company. I mean, it doesn't, it, we've got lots of little nuances here that suggest possibilities. They're sort of pregnant with possibilities, but there's not much here between the dots. Well, Your Honor, I think you have to take that in context. We have, if you look at the restatement, and recall, a restatement is an admission that these financial reports were false when issued. They admit in the restatement that they capitalized payroll without any supporting documentation. They admit that they capitalized payroll as software development, as purported software development that had nothing to do with software development. And that is in our complaint at paragraph 72 and, 72 through 74. These aren't the kind of errors that happen accidentally. So when you combine that with these direct percipient witness accounts, that defendants were involved in the accounting closing process, and when you combine that with defendants' admission of their material accounting control weaknesses, that raises at least an equally compelling inference that these accounting errors were the product of fraudulent intent and not inadvertence or innocence. Moving on to defendants' manipulation of the inventory account, again, plaintiffs plead direct percipient witness accounts that defendant Ranjit ordered a shadow database to account for inventory beginning in the first quarter of 2004. Which paragraphs are you talking about now? Paragraphs 50 and 51. It's in our excerpt to record at 98 and 99. So instead of using DigiMark's secure accounting system to account for inventory, defendant Ranjit ordered that the company use these insecure databases to account for inventory, and that he used those databases to manipulate the amount of inventory capitalized I'm sorry, the amount of inventory reported at the close of every quarter. You wanted to save a little time for rebuttal. You're under your two minutes. Yes, Your Honor. I better. I'm sorry. I should save the balance of my time for rebuttal. You have about a minute and a half. Thank you for your argument. We'll hear from DigiMark at this time. Mr. Ellis? Thank you, Your Honor. Let me talk about the issues he talked about. This allegation that a accounting control was removed. What you need to understand is what the accounting issue was. The software capitalization rules are complicated. You're not permitted to capitalize software expense in the pre-development phase. You're not permitted to capitalize software expense in the post-development phase. But you are permitted to capitalize software expense in the development phase. So to say that someone other than the person whose time is involved can have access to the data to decode it on this pre-development, post-development issue is perfectly logical. And that's what Judge Brown found in the oral argument below, that there's nothing sinister about having someone who understands the capitalization rules be involved in that process. He then talks about inventory. And what's interesting is in the restatement, inventory at the end of 03 was increased over what had been reported. So all of this confidential witness testimony that they've put in about what they think are suspicious inventory issues go out the window because the restatement itself increased inventory value, did not decrease it. Now, I agree with him that Telabs is the controlling decision on the Cyanar issue. But we think Telabs has two tests. One is the stand-alone test, and you look at the allegations of the complaint, and we agree, you look at it holistically, not in isolation. You look at it on a stand-alone basis to determine does it really create a strong inference of fraud. Now, he kept saying to you on the restatement that that's an admission that it's false. It's an admission the numbers were wrong. It is not at all an admission that anybody intentionally misstated numbers. That's what the Cyanar issue is all about. Then the second Telabs test is the comparative test. And you can't just view complaints like this in isolation. You do need to look at the competing non-culpable inferences. Well, here you've got a very small company that did a remarkable transaction. When it acquired the DID division out of bankruptcy from Polaroid, one of the CWs refers to that as the minnow swallowing the whale. And the DID division, this is the state licensing division, became 89% of the business. So headquarters in Oregon is now trying to manage a business located principally in Boston, in the Boston area, that is multiple times larger than the business they had been doing. So they have this enormous integration problem, and simultaneously they are converting from several legacy accounting systems to a new accounting system company-wide and a new materials resource planning system company-wide. So both of these things are happening simultaneously. There are a lot of moving parts, and it is not at all surprising that something would come out of that that wasn't accurate and needed to be restated. At the end of the day, when the financial statements were restated and the dust had settled, what had happened back at the time the original statements were made? I'm not sure I'm getting the question. What had happened? There came a point in time when the financial statements were restated, and the company said, okay, we need to restate these items because of A, B, and C. What was it that happened earlier? Yes. The inference we think is most logical is these two, really three, major changes happening inside the company. The acquisition of the new division, I think it's something like 289 employees. It is 89% of the business going forward. So you have the integration issue, and you have the conversion issue. And those two things happening simultaneously, errors do occur. Now, the issues that we're talking about, I've mentioned software capitalization. You can see how that could easily lead to something that would be erroneous, because when does a particular software project move from being the pre-development to the development? And when does that same project move from being development to post-development? And it's permissible to capitalize in that development period. It's not permissible to capitalize in the pre- and the post-period. And then the second item to talk about is project accounting. And what that means is a particular employee codes his or her time to, let's say, the New Jersey project or the Minnesota project. If those, you know, that gets you down to a fairly detailed, small granular level of activity. Those codings can be mistaken. And obviously what the company concluded when it first announced the likelihood of a restatement, and then it took it nine months to complete the restatement. This was a long and difficult process. Now, in the restatement, the company has not said, and we have concluded that there was fraudulent behavior. Not at all. Now, in this case, what the plaintiffs rely on are six so-called confidential witnesses. But if you look at it, it's pretty thin. Two of those, I think this is number four and number five, weren't there during the class period. They had left before the class period even started. And I think Judge Brown quite correctly said, I give no weight to what they say. Two, this is CW1 and CW2, are really the same because CW2 reported to CW1. They were two fellows, presumably fellows, in the IT group. They're not accountants. They're in the IT group. They obviously believe Great Plains was wonderful, and they believe that any skepticism management had about the accuracy of the data coming out of the new system. They don't accept that management honestly was concerned at the accuracy of that data. A lot of what they say is suspicious is not suspicious. When you have a new accounting system like that, to develop a parallel data set to try to satisfy yourself that the data you're getting from the new set is consistent with the data from the parallel set, that's not suspect. That's just good management. Then they have one CW who was a financial analyst, had nothing to do with the three accounting issues that they talk about. So when you melt it down, these CWs, there are very few of them. Of those they have, there are very few that have anything close to the kind of personal knowledge that this court in Dow said was essential. And then you look at, and I might mention the Seventh Circuit case in Higginbotham, where the Seventh Circuit is now saying they really question how much weight should be put at all on this pleading of confidential witness statements. They say, why do we do that? There's no informer's privilege in civil litigation. In this case, all of the CWs are X, so there's no credible retaliation issue. It's just a way to allow the pleading to be done in a way that lets the plaintiff's lawyers craft these multi-part statements, attributed in part to CWs, but you don't know when the multi-part statement stops being a CW statement and starts becoming a lawyer's inference. Then you have, many of these statements are conclusory. I don't know what the word munge means. I tried to look it up. It's not in any of the standard dictionaries. If you look in Google, you'll find a couple of definitions, one of which is that it means to create a strong, secure password through character substitution. Well, I don't know what the word means. So when you, as a reviewing court, look at an allegation attributed to an anonymous witness, who uses a word that I'm guessing neither of you is confident you know what it means, that doesn't get you very far. This CW allegations are loaded with hearsay. Sometimes they'll attribute it to the other spokesperson, but they don't tell you whether the other spokesperson was in the company or out of the company at the time of the statement. Most of the time it's, you know, finance people said this, which doesn't tell you much of anything. Let me see if I can, if I understand this at the risk of overgeneralization. What occurred at the time of the restatement of the financial statements was the company, on the advice of internal or external auditors, concluded that some software development cost, which in fact occurred either pre-development or post-development, earlier had been stated as having been done during the development stage. Correct. Is that right? You have that exactly right. Were these fixed dates? I mean, was there a date, a fixed date when pre-development ended and development started and then development stopped and post-development started? There are multiple projects. They were different as to each project. So different projects, different dates. But it's that kind of accounting issue we're talking about. This isn't like some of the revenue recognition cases where senior management really can, you know, impose their views on what's going to be recognized or not recognized. This is down at a fairly low level in the company. They have one CW on the inventory issue who's located in Indiana. Well, this is a company that's headquartered in Oregon. Its division headquarters is in Massachusetts. Here's the CW located in Indiana. And he may or may not have seen and observed what he says, but where can anyone have confidence that that's company-wide material or senior management activity? And then if I could, that's what I wanted to say on SAN, or I don't want to leave it if you still have questions. I don't see any. Go right ahead. On the loss causation, I did present this chart, and there are two earnings releases. Judge Nelson, do you have the chart now? Yes, I have it. Okay, thank you. Go right ahead. And if you look at September 13 of 2004, that's the first announcement of possible accounting errors and a possible restatement. And you'll see it has no impact on stock price. And then they don't complete the restatement until March and April. And, again, it's not something significant on stock price. But if you go back, what the plaintiffs have done is what plaintiffs' lawyers do. They look to see, well, we'll figure out by hindsight when the stock dropped, and then we'll say that must be attributable to these three accounting issues. Well, it doesn't wash. Because if you look at the January 2003 price drop, and if you look at the press release that was issued that day that led to that price drop, it was a top-line failure. Their revenues were lower than they had expected. That has nothing to do with cost issues. And yet the plaintiffs, because they want to pick up whatever class members and dollars they can, try to attribute that to the accounting issues. And then if you look at the July 28, which is the second press release, it does refer to some inventory write-downs. And there's nothing sinister about that. Inventory write-downs happen as ordinary business. It refers to those. But I would point out to you the ultimate restatement actually increased the value of inventory at the end of 03. So the first four quarters of this case, if they want to talk about inventory, it actually increased. And then if they want to argue, well, that suggests that margins going forward were going to be less, the company at the time it issued that, and obviously was disappointed with both the revenue, the earnings, and the margin, acknowledged that margin going forward was going to be less, but it was going to be significantly greater than the margin for the second quarter. So to try to find in either of those press releases some statement to the market that what we have here are these three accounting issues of software capitalization, inventory, and project accounting is just hindsight. It's not there. Okay. Thank you. You're out of time. Thank you for your argument. We'll hear a rebuttal argument at this time. Mr. Reese? Thank you, Your Honor. First, I want to address Judge Hawkins' question about the software capitalization issue. And what defendants have no answer for is that they admitted in the restatement, and this is paragraph 72 through 74, that they capitalized as software development costs, costs that had nothing to do with software development. They capitalized software development costs with no supporting documentation. They admitted in the restatement they had no process for tracking capitalization of costs. So this is not accidental inadvertence. This is capitalizing with no supporting documentation and costs that have nothing to do with what they're capitalizing. In addressing the inventory manipulation, we specifically allege that the creation of these shadow databases for inventory manipulation begins in the first quarter of 2004. So when he talks about 2003 and inventory being written up, that has nothing to do with that allegation. But consistent with that allegation in the first quarter of 2004, the company admitted in the restatement that they falsely capitalized ordinary expenses as inventory and fixed assets. So that is directly corroborated. It directly corroborates the confidential witness accounts that they were using this shadow database system to write up their inventory improperly. Moving to loss causation, as Judge Hopkins wrote recently in the Gilead case, the critical issue is whether we allege a plausible loss causation theory or enough facts to raise a reasonable expectation that discovery will reveal evidence of loss causation. We fully satisfy this standard. Digimarc's corrections or corrective disclosures revealed exactly what defendants had been concealing with their false accounting practices. Digimarc revealed that it was not profitable, that it had deteriorating gross margins, gross profit margins. But the announcement in September of 2004 doesn't – there's no drop in the market. That's correct, Your Honor, because by that point – in fact, when they announced in July of 2004 that they've got overvalued inventory on their account, they've got deteriorating gross margins, they've got huge losses rather than profits, every market analyst covering the stock downgraded the stock that day. One analyst specifically quoted as saying, Digimarc's financial management and internal control problems are snowballing. In other words, the market recognizes – Right, but that's not evidence of fraud. That may be evidence of poor management, it may be evidence of a lot of things, but it's not necessarily evidence of fraud. What we have to state here, Judge Biby, is a plausible loss causation theory, that these corrective disclosures caused our loss. And what the market recognized with those disclosures is we're no longer going to rely on the previous false financial statements anymore. We're going to value the stock going forward on where it really is. It's a company with deteriorating gross profit margins. This is exactly analogous to the situation in Dow. The reason the stock doesn't move when the restatement is issued six weeks later is the company has already discounted the false financial reports. That is entirely consistent with our plausible loss causation theory. In the Dow case, we actually have a more plausible theory than the Dow case where the plaintiffs in that case quoted an anonymous analyst questioning the previous accounting reports. Here we have an overt analyst, the key analyst covering the stock, saying this is a company with serious internal control and financial management problems. Okay, you're over your time. Thank you, Your Honor. Thank you both for your argument. Very interesting case. It will be submitted for decision, and we'll proceed to the next case on the argument calendar.
judges: Nelson, Hawkins, Bybee